**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JANE DOE,

Plaintiff, Civil Action No. PX 26 CV 4253

v.

KONIAG GOVERNMENT SERVICES, LLC, and
RAY-DELEON J. COLEMAN,

Defendants.

USDC - GREENBELT
'26 OCT 9 PM 1:27
HD
Rcv'd by: HE

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Jane Doe, proceeding pro se, alleges as follows:

## I. NATURE OF THE ACTION

1. This action arises from Plaintiff's employment with Koniag Government Services, LLC ("KGS") as an M365 Development Lead, from February 3, 2025, to September 12, 2025.

2. Plaintiff alleges that Ray-DeLeon J. Coleman ("Coleman"), KGS's Chief Information Officer, subjected her to unwelcome sexual conduct; that after she declined his advances, he subjected her to different treatment; that she complained about that treatment in writing and to Human Resources; and that KGS terminated her employment shortly after a security inquiry. Plaintiff asserts claims for sex discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, and race discrimination under 42 U.S.C. § 1981.

## II. PARTIES

3. Plaintiff is a Black woman who lives in Prince George's County, Maryland, and primarily worked remotely from there.

4. KGS is a limited liability company with an office at 4840 Westfields Boulevard, Suite 200, Chantilly, Virginia 20151. KGS employed Plaintiff.

5. Coleman was KGS's Chief Information Officer and was Acuna's supervisor. He is Black. He interviewed Plaintiff and was personally involved in the events described below.

6. Acuna was Plaintiff's direct supervisor. Denise Bailey ("Bailey") communicated Plaintiff's termination. Alex Burkart ("Burkart") led a security inquiry involving Plaintiff. Acuna, Bailey, and Burkart are identified as witnesses and are not named as defendants.

## III. JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3), because Plaintiff asserts claims under Title VII and 42 U.S.C. § 1981.

8. Venue is proper in this District because Plaintiff performed her work from Prince George's County, Maryland, and the events described occurred there.

9. Plaintiff filed an administrative charge with the Equal Employment Opportunity Commission against KGS on June 1, 2026. The EEOC issued a Notice of Right to Sue dated July 13, 2026.

## IV. FACTUAL ALLEGATIONS

### A. Hiring and Early Statements

10. KGS hired Plaintiff as an M365 Development Lead effective February 3, 2025, at an annual salary of approximately $150,000.

11. Plaintiff was the only Black woman on Coleman's team. Coleman was the only other Black member of the team.

12. In or about March or April 2025, Coleman told Plaintiff in his office, when no one else was present, that he wanted to hire two Black women for the SharePoint positions but had found only one.

13. Coleman also told Plaintiff that a white coworker, Non-Party Coworker A, seemed interested in him, that she was not his type, and that he preferred Black women.

14. In or about February or March 2025, Coleman and Acuna referred to the women on the SharePoint team as "the SharePoint girls."

**B. The Hotel Incident**

15. In March 2025, on a weekday after work, Coleman invited Plaintiff to what she believed was a work-related group event. It was one-on-one.

16. Coleman brought Plaintiff to the hotel where he was staying, continued providing drinks, kissed her, and brought her to his room.

17. Plaintiff was intoxicated and passed out. When she woke up, Coleman was masturbating beside her. Plaintiff did not see how that started and did not have sex with Coleman.

18. Plaintiff was shocked and did not respond at that time.

**C. Camera Requirement and Workplace Treatment**

19. Before June 2025, Umar, a contractor on the team, told Plaintiff that he was usually on camera but turned to the side until he was called on. Plaintiff followed that practice.

20. After Plaintiff declined Coleman's sexual advances, Coleman called out her camera position and required her to keep her mouth visible on camera.

21. The KGS camera policy does not require a person to keep her mouth visible on camera.

22. On June 10, 2025, Plaintiff asked Coleman and Acuna in writing for clarification of the camera requirements.

23. On June 11, 2025, Acuna replied in writing that the IT policy has always been to be on camera unless driving, and referred to "proper webcam placement/positioning." Acuna did not state in writing that Plaintiff had to keep her mouth visible on camera.

24. On or about June 10, 2025, Acuna told Plaintiff, orally, that Coleman had said: "Ray said you need to make sure to have your mouth on camera."

25. After Ms. Shah was terminated, Plaintiff was the only Black woman on the team for the rest of her employment. Other team members, including male members, did not keep their mouths visible on camera and were not required to.

26. Plaintiff has screenshots showing Coleman on camera with his face partly turned away and his mouth not visible.

27. Plaintiff raised the disparity in writing and in a meeting. Coleman told Plaintiff to say something about it in the meeting. Coleman addressed the issue once himself, but he did not consistently face the camera or keep his mouth visible.

28. Beginning in spring and summer 2025, Coleman directed Plaintiff's work outside the normal reporting structure and directed customers to contact him rather than follow normal procedures. Plaintiff was subjected to increased scrutiny, micromanagement, and heavier workloads, and was sometimes given only hours to complete multiple tasks.

29. Coleman assigned Plaintiff tasks with as little as eight hours' notice. In or about summer 2025, Coleman introduced a requirement that Plaintiff notify him at least 48 hours in advance if she would not finish. The SharePoint team did not have that requirement before Plaintiff joined. Coleman introduced it after he began requiring Plaintiff to keep her mouth visible on camera, and after Plaintiff declined his sexual advances.

30. In July 2025, Plaintiff wrote to Barbara Mack in Human Resources about deadlines set by Coleman without consulting the team, a turnaround of less than eight hours on one request, and the resulting delays, rework, and strain on the team. Plaintiff asked for guidance and support.

**D. The SharePoint Hiring Process**

31. On or about February 17, 2025, Coleman hired Madiha Shah ("Ms. Shah"), who is not Black, for a SharePoint position on his team. Ms. Shah started on or about February 18, 2025.

32. Plaintiff told Acuna verbally that Ms. Shah was not a developer. Umar, the contractor Plaintiff replaced, confirmed that to Acuna. Ms. Shah was terminated within approximately one month.

33. On or about April 7, 2025, Coleman and Acuna met with Plaintiff in Coleman's office and asked her to put her concerns about Ms. Shah in writing. They helped her prepare the summary, which Plaintiff sent to Acuna on or about that date.

34. When KGS later filled the SharePoint position, Plaintiff conducted the technical interview, changed the hiring recommendation, and worked with Human Resources to issue technical specifications for the role.

35. Acuna told Plaintiff, in repeated conversations several times a day, that things would get better once KGS hired another person. Instead, Plaintiff's treatment worsened.

**E. Complaints to Management and Human Resources**

36. In or about spring and early summer 2025, Plaintiff reported to Human Resources, in a Microsoft Teams call with Barbara Mack, that she felt targeted by Coleman because she is a woman, and asked whether the mouth-on-camera requirement was because she is a woman. Ms.

Mack took notes of the call. Human Resources held meetings about Plaintiff's complaints, but Coleman continued his conduct, and KGS took no further action to stop him.

**F. Security Inquiry and Termination**

37. Acuna called Plaintiff and asked her to bring in her work laptop because KGS believed she might have a virus. Plaintiff was not told that the matter was a security investigation. She was told only that KGS was checking whether she had a virus.

38. On or about September 5, 2025, Plaintiff attended a security-related meeting led by Burkart. Plaintiff asked for documentation about that process and did not receive it.

39. During that process, Plaintiff was specifically asked: "Tell me about the Power BI business with your son." Plaintiff denied having such a business.

40. Plaintiff asked Acuna whether she should get a lawyer. Acuna responded by asking why she would need one if she had done nothing wrong.

41. On or about September 12, 2025, Bailey informed Plaintiff during a call that she was being terminated for having a business with her son. Coleman was also on the call. Plaintiff denied having such a business. Bailey stated that the matter was "not up for debate."

42. Plaintiff asked Bailey for documentation supporting the stated reason and did not receive it. Plaintiff's termination paperwork did not state a reason.

43. Maryland unemployment later awarded benefits, finding insufficient substantiation for KGS's stated reason.

44. Plaintiff lost her salary and benefits and experienced stress, anxiety, and effects on her health, sleep, and focus. Plaintiff also had to take in a renter to help cover her expenses.

45. On or about September 5, 2025, Kadiak, LLC, which Plaintiff understands is affiliated with KGS, appears to have become associated with Plaintiff's Defense Information

System for Security record and then relinquished that role the same day. Plaintiff was not employed by Kadiak and was not told of any Kadiak contract. Plaintiff does not know who made the change.

## V. COUNT I: SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT

(Title VII, against KGS)

46. Plaintiff incorporates paragraphs 1 through 45.

47. Plaintiff is a woman.

48. Coleman, KGS's Chief Information Officer, subjected Plaintiff to unwelcome sexual conduct, as described in paragraphs 15 through 18.

49. After Plaintiff declined Coleman's advances, he subjected her to a continuing pattern of different treatment because of her sex, including the mouth-on-camera requirement, the 48-hour notice requirement, and increased workload, as described in paragraphs 20 through 29.

50. The conduct was severe or pervasive enough to alter the terms and conditions of Plaintiff's employment.

51. KGS is liable. Coleman was KGS's Chief Information Officer. KGS knew of Plaintiff's complaints about this treatment in spring and summer 2025 and did not stop it.

## VI. COUNT II: SEX DISCRIMINATION

(Title VII, against KGS)

52. Plaintiff incorporates paragraphs 1 through 45.

53. Plaintiff is a woman and was treated less favorably than male members of the team. The mouth-on-camera requirement was applied to Plaintiff and not to other male members of the team, as described in paragraphs 25 and 26.

54. KGS introduced a 48-hour notice requirement for Plaintiff after she declined Coleman's advances, as described in paragraph 29. Coleman also tightened deadlines and made work harder to complete by compiling workloads, projects, and tickets with shorter deadlines. Only after Plaintiff's complaints to Human Resources did Coleman begin interfering with customer communications that had established processes.

55. On or about September 12, 2025, KGS terminated Plaintiff's employment for an alleged business with her son. Plaintiff denied the business, and Maryland unemployment later found that KGS did not establish misconduct, as described in paragraphs 41 and 43.

56. Plaintiff's sex was a motivating factor in these decisions.

## VII. COUNT III: BATTERY

(Maryland law, against Coleman)

57. Plaintiff incorporates paragraphs 1 through 45.

58. Coleman kissed Plaintiff. Plaintiff was unable to consent because she was intoxicated, as described in paragraph 16.

59. Coleman's contact was intentional and offensive, and it caused Plaintiff harm.

## VIII. COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(Maryland law, against Coleman)

60. Plaintiff incorporates paragraphs 1 through 45.

61. Coleman provided Plaintiff drinks after she was intoxicated, brought her to his hotel room, and masturbated beside her while she was unconscious, as described in paragraphs 15 through 17.

62. Coleman's conduct was extreme and outrageous.

63. Coleman intended the conduct or acted with reckless disregard of the likelihood that it would cause distress. The conduct caused Plaintiff severe emotional distress, as described in paragraph 44.

## IX. COUNT V: WRONGFUL DISCHARGE IN VIOLATION OF MARYLAND PUBLIC POLICY

(Against KGS, pleaded in addition to and in the alternative to Plaintiff's statutory claims)

64. Plaintiff incorporates paragraphs 1 through 45.

65. Maryland public policy prohibits an employer from discharging an employee for opposing sex-based discrimination or harassment.

66. Plaintiff opposed sex-based treatment in her written request of June 10, 2025, as described in paragraph 22, and in her Teams call with Human Resources, as described in paragraph 36.

67. On or about September 12, 2025, KGS terminated Plaintiff's employment for opposing that treatment. The stated reason, an alleged business with her son, was denied, and Maryland unemployment later found that KGS did not establish misconduct, as described in paragraphs 41 and 43.

## X. COUNT VI: RETALIATION

(Title VII, against KGS)

68. Plaintiff incorporates paragraphs 1 through 45.

69. Plaintiff engaged in protected activity by opposing sex-based treatment, including through the June 10, 2025 written request described in paragraph 22 and the Human Resources complaint described in paragraph 36.

70. After those complaints, KGS subjected Plaintiff to a security inquiry on or about September 5, 2025, as described in paragraphs 37 through 39, denied her requested documentation, as described in paragraph 42, and on or about September 12, 2025, terminated her employment, as described in paragraph 41.

71. The termination was caused by Plaintiff's protected activity. The close timing supports this inference.

## XI. DAMAGES

72. Plaintiff seeks back pay, front pay, compensatory damages, punitive damages where permitted by law, interest, costs, and attorney's fees where authorized by law.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor on each count, award the damages and relief described above, and grant any other relief the Court deems just and proper.

## XIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Jane Doe
Jane Doe
Plaintiff, Pro Se

Date: October 08, 2026